| | |
|---|---|
| 83 | 553 |
| 88 | 487 |
| 88 | 559 |
| 83 | 553 |
| 89 | 285 |
| 83 | 553 |
| 90 | 541 |
| 83 | 553 |
| 92 | 358 |
| 83 | 553 |
| o100 | 241 |
| 83 | 553 |
| 102 | 916 |
| 83 | 553 |
| o103 | 425 |
| 83 | 553 |
| 107 | 513 |

N. & W. R. R. Co. v. Harman's Administrator.

June 30th, 1887.

1. Practice at Common Law — *Negligent injuries — Declaration — Demurrer.*—Plaintiff alleges in his complaint that defendant company, on its railroad, in the county of M, did carelessly and negligently, and with force and violence, run and drive one of its engines and divers of its cars and coaches upon and against the plaintiff's intestate, T. H., then and there being, and then and there did so greatly wound said T. H. that by reason thereof he then and there died, and that his death was caused by said wrongful act, neglect and default of said company, &c.

Held :

Such declaration is sufficient on demurrer. *B. & O..R. R. Co.* v. *Shearman's Adm'r,* 30 Gratt. 602.

2. Idem—*Argument—Reading cases to jury.*—While it is the court's province to give the jury the law, and the jury's to deal with the facts, it is an unwarrantable restriction upon the legitimate scope of argument, if not a flagrant usurpation, for a trial court to prohibit counsel in this State, at least, from referring to and reading from recognized authorities, and especially from decisions in similar cases by courts of the last resort.

3. Idem—*Demurrer to evidence—Jury's province—Scope of argument.*— After demurrer to evidence by defendant, trial court instructed the jury that they were not to enquire whether or not the plaintiff was entitled to any damages; that the demurrer withdrew that question from the jury; that the jury could only conditionally assess the damages sustained by plaintiff, and in so doing the jury should consider the evidence only as bearing on the measure of damages ; and that defendant's counsel would be permitted to argue before the jury upon all the evidence in mitigation, but not in bar, of damages.

Held :

This ruling is strictly in accord with the settled rule of practice.

4. Appellate Court—*Unreliable witness.*—Where statements of a witness appear in the certificate of the evidence to be˙ contradictory in certain particulars, and in other respects vague and unintelligible, such witness becomes unreliable, except when corroborated by the testimony of other witnesses.

5. Railroad Companies—*Duty toward trespassers.*—Such company is bound to keep reasonable lookout for trespassers on its track, and to exercise such care as the circumstances require, to prevent injury to them. If trespasser is adult, and apparently possesses his faculties, the company has a right to presume that he will exercise his senses and remove himself from his dangerous position ; and if he fails to do so, and is injured, the fault is his own, and there is, in the absence of wilful negligence on its part, no remedy against it for the results of an injury brought upon him by his own recklessness.

6. Idem—*Case at bar.*—The record discloses a case where plaintiff's intestate came to his death on the company's track by collision with a tender attached to one of its engines, under circumstances which. show that the death was not the result of any negligence whatever on. its part, but of the intestate's own gross heedlessness.

Error to judgment of circuit court of Montgomery county, rendered tenth December, 1886, in the action of trespass on the case for damages under Code 1873, chapter 145, §§ 7, 8, 9 and 10, for the negligent killing of one Taylor Harman by the Norfolk & Western Railroad Company, wherein his administrator, Hannibal Harman, was plaintiff, and said company was defendant. During the trial the defendant took several bills of exceptions to the rulings of the court, which are treated of in the opinion. When all the evidence on both sides had been given to the jury the defendant demurred to the plaintiff's evidence, and the latter joined in the demurrer. The jury found for the plaintiff $2,700 damages, subject to the opinion of the court on the demurrer, which opinion ˙was given for the plaintiff, and judgment—after the defendant's motion to set aside the verdict as excessive and as contrary to the evidence had been overruled—was entered in accordance with the verdict, and the defendant excepted. On application to one of the judges of this court the defendant was

allowed a writ of error and *supersedeas* to said judgment. Opinion sets forth the facts of the case.

*T J. Kirkpatrick*, for plaintiff in error.

*Staples & Sullivan, G. G. Junkin*, and *Phlegar & Johnson*, for the defendant in error.

We are *toto cœlo* apart from appellant in his statement of the facts. He ignores all testimony against him seemingly forgetting that he is here as a demurrant evidence.

It is proved that the defendant company had leased part of their lands at Central to a circus show, and that the show-ground and snack stands run by the showmen were close to the track; that by running excursion trains, &c., the company had been directly instrumental in collecting a large crowd. There was no way of getting to the ground except by crossing the railroad tracks (see testimony of Collins, depot agent), and the most convenient way was up the tracks, which were freely used by both railroad employees and the crowd in going to and coming from this show. Harman started from Hoffman's, took the precaution to clamber up the bank on the south side of railroad, and thus walk down the path, towards the show; appellant strongly complains that he did not walk down this very path.

When near a road- crossing (seventy-five feet)—the second freight train approaching—he started across the railroad, naturally using a platform then permitted by the company, crossing in front of the train. He gets on next track and carefully looks back, down the road, towards depot. There was no train or engine in sight, except the two freights, both going east. The first train was crossing the "cut-off," (see map); the second, that of A. West, passing along by Harman. The crowd was passing backward and

and forward, as they had been all day. Coleman's engine was east of the first freight, ringing his bell to be let through between the two trains. The switcher was on the track and heard him, but no one near Harman could either hear or see. Harman seeing that there was no train in sight, except the two freights, both going east and occupying both tracks, starts to the crossing, a distance of only seventy-five feet. Just then the impatient engine man is let through between the two freights by switchman Michie, and darts down the track to clear the cut-off before the engine of West's moving train reaches it, thus rushing amongst the people unexpectedly and "right fast." It is true he pulls his bell rope, but the people in danger are close to West's rumbling train, exhausting engine and ringing bell, and none of them heard the bell. (See their evidence.) He blows no whistle until he strikes Harman. He sees Harman's insensibility to danger and that he is not paying attention to the bell, but runs on, "hoping he will get off the track as the others did." These others were facing the engine and were escaping for their lives, and in great terror. Harman had his back to it. His attitude showed that he did not know of the engine. Mrs. Carden saw his danger, so did Fanny Harvey. She says: "It was right on him and he didn't seem to know it was behind him—engine making no attempt to stop, until it strikes and runs over Harman." It is clearly shown by plaintiff's evidence that no attempt was made to stop the engine until just as it struck him, and that the engine was running rapidly. The defendant's evidence to the contrary must be excluded.

Harman was not negligent. In going on the track he did what the company had, by putting the show where it was, licensed and invited the public to do.

By slowing down its trains during the day the company had advertised that it would protect persons walking on

its tracks. It was the company's duty so to do. 4 Wait's A. D. 689. The platform at Robinson's (long permitted by the company) was an invitation to go on the tracks at that point. "It was just a nigh cut across there—the way he took." *Sweeny* v. *Old Colony R. R. Co*, reported in full in 1 Thomp. on Negligence, 408; also cases there cited. He used his senses carefully. He looked behind him and saw nothing coming his way. Nothing could come unless it rushed between two trains "but a few seconds apart." 2 Ward's Ry. Law, 1306-7-8; 1 Thomp. on Neg. 420, 424, 404; Wharton on Neg. § 382, note; Pierce on R. R's, 344. He had but twenty-five yards to walk to crossing. The first freight train blocked the track at the cut-off, one hundred yards behind him, and the second freight would in a few seconds block it again. It was not negligent to suppose he could walk twenty-five yards before another engine could get the track and run one hundred and twenty-five yards. Coleman's engine was a masked battery—an enemy in ambush. Wharton on Neg. § 386.

The railroad company was negligent—

I. In rushing its engine between two trains when it was not reasonable to expect it. 1 Thomp. on Neg. 404.

II. In permitting Coleman to go up the track without the cautions given to other engine-runners.

III. In relying on bell alone as danger signal when another engine-bell was ringing and another moving train would likely prevent bell being heard. 1 Thomp. on Neg. 424.

IV. In not slowing speed of engine when engineer saw a number of persons on the track. 1 Thomp. on Neg. 453; same, 418; 4 Wait's A. D. 655, 659 and 466.

V. In not stopping its engine when it was, or should have been, evident to Mr. Coleman that Harman was insensible to his danger. Mrs. Carden, Mr. Carden, Fanny Harvey and Alex. West all saw that he was insensible to it. Why

did not Mr. Coleman see it? 1 Thomp. on Neg. 448, § 1.

VI. In running its engine rapidly. There is a conflict of evidence on this point. The demurrant's evidence must be rejected. How fast was the engine running? Wynne says: "Shifter was coming pretty fast." Jim Harvey: "Pusher coming right fast." Coleman (p. 47) says he started from a point probably 100 feet east of Hoffman's crossing. From there to where Harman was struck (three or four feet east of county road crossing) is seven hundred and sixteen feet. Harman had walked seventy-one feet at two miles per hour. Coleman's engine, therefore, moved ten times as fast as Harman, or near twenty miles per hour. Was not this recklessness at that time and place?

The extent of the duty of both Harman and the company is to be determined by a consideration of the circumstances in which they were placed. The law imposes duties upon men according to the circumstances in which they are called to act. 78 Va. 659.

Harman's circumstances were—a place, use of which railroad company had permitted for the very purpose he was using it; track behind him blockaded by a train moving in opposite direction with another train to repeat the blockade in a few seconds. Nothing in sight pointing his way.

The railroad company's circumstances were—a knowledge of the use of its tracks by crowds of people; admission of its duty to be very careful; knowledge of the blockade of track and its liability to deceive pedestrians; knowledge that noise of other train would drown noise of engine; knowledge that he was walking down track without noticing engine.

Under these circumstances had its servants a right to presume anything as against the safety of the man on the track?

The petition for writ of error treats Harman as a tres-

passer, to whom the railroad company owed no duty. He was not a trespasser, and was at least entitled to the rights and privileges of a person on a highway and railroad-crossing. A recent New York case, cited in 2 Wood's Railway Law, pp. 1293-4-5, has well decided that where a railroad company for a long while acquiesces in the public using a given point as a crossing, its acquiescence amounts to a license and permission to cross there and it owes the duty of reasonable care to those crossing there. If this be so, surely where the company leases a lot for a particular purpose for a day and permits all persons to use its track, as the best way of getting there, and in the morning used precautions to prevent injury to persons so using its track, these acts amount to a license and permission, if not to an invitation, to use the tracks, and it owed the same (if not a higher) duty than it would have owed if Harman was there by a mere legal right. 1 Thomp. Neg. 408.

In same book, p. 1310 note and 1314, it is stated as law, and reasonable law, that where a railroad company had kept gates or a flagman at a crossing, although not bound by law so to do, a person passing and finding the gates open or flagman gone had a right to infer there was no danger. So Harman, from the precautions used that morning, had a right to infer that the same would be used that evening. If he is to be considered as there by invitation of the company, for its benefit, he was entitled to same protection as a passenger, and only the most ordinary care was required of him, and the utmost care was required of the company. He was not even required to look for danger, and was only required to avoid what he saw.

In 2 Wood's Railroad Law, pp. 1306-7-8, the exceptions to the rule requiring a person on railroad track to look and listen for approaching trains are stated—the second and third as follows :

2d. Where the injured person was a passenger going to

or alighting from a train, and hence under an implied invitation and assurance by the company to cross the track in safety.

3d. Where the direct act of some agent of the company had put the person off his guard and induced him to cross the track.

Wharton's Law of Negligence, § 390, says: "So it has been held to be negligence for a company to run a train of cars between a car whose passengers are disembarking and the station which such passengers are striving to reach." 1 Thomp. on Negligence, 408, 412, 413.

If Harman was only entitled to the care due a traveller at a highway crossing, and was bound to same diligence as such a traveller, his administrator is entitled to recover. He was only required to look for what he could see and listen for what he could hear, and if the company's acts prevented his seeing and hearing the danger it is liable.

See *Ritchie* v. *Caledonian Railway*, in Wood's Railway Law, pp. 1331–2: Traveller's view obstructed by a fence, signal box, and shunted train; his hearing by steam escaping from a standing engine. If a signal was given it was not the alarm whistle. Railroad company liable for running over him.

*Hutchinson* v. *St. Paul Railway*, 2 Wood's, 1307, note: Traveller when fifty to seventy yards from track had looked for danger and saw none. Her attention was attracted by a passing engine in opposite direction, and when on the track she was struck by an engine from direction she had first looked. Question of due care by plaintiff held rightly submitted to a jury.

2 Wood, p. 1310, says: "But if the company has made erections, or left cars in such a position as to obstruct the view of the track in one direction, the traveler will be excused from looking in that direction. He is only bound to look when to do so will aid him in determining whether

a train is approaching.   In all other respects he has a right to rely on his ears."

The first exception—2 Wood, p. 1306—to rule requiring traveler to look is, " where the view of track is obstructed, the injured party, not being able to see, is obliged to act on his judgment at the time."

Permitting two trains to meet where persons have a right to cross the track, both not being in plain sight for such a distance that a traveler cannot see and avoid both, is negligence on the part of the company, and when his attention is attracted by one of the trains, with a view of saving himself, so that he does not see the other, by which he is injured, the company is liable.   2 Wood, pp. 1317–18.   It was the meeting of the train and engine, Harman's inability to see the engine which struck him, and the unexpected backing of that engine up the road which caused the injury.

Wharton's Law of Negligence, § 390: "If a person watching on a road takes due precaution to avoid collision, but the collision occurs from the train being moved unexpectedly, to the surprise of the person so watching, he can recover, if there was negligence in so moving it."

§ 391: " Nor, as has been seen, does the fact that the plaintiff was a trespasser, relieve the company from liability from the consequences of darting their cars to and fro without notice over a passage-way."   Also see 2 Wood, pp. 1325–26, notes, citing *Philadelphia R. R.* v. *Carr.*

The petition lays much stress on Harman's being between the rails, when he might have walked between the tracks or on a path outside the tracks.

Every person injured on a railroad train or track might have been somewhere else, and if he had been, would not have been injured.   Wharton on Neg. § 388, note 3, p. 352.

The fact is, he was between the rails, and the question is not could he not have been somewhere else, but what

duty did the company owe him when there, and how was that duty discharged? We think it owed him the duty of running its trains with great caution, and of giving signals which another train would not drown. We think it owed him the duty of so running its trains that all coming and going engines could be plainly seen by him for a reasonaable distance when he went on the track. It performed none of these duties. If Harman was guilty of contributory negligence in walking on the track as he did, his administrator is still entitled to recover, because "the injury was not the necessary, ordinary or likely result of such contributory negligence, but was due to the wholly unlooked for and unexpected" darting of the engines between the two freight trains, "which could not have been reasonably anticipated, or regarded as likely to occur, and such contributing negligence is too remote to be set up as a bar to the action." 2 Wood's Ry. Law, pp. 1254–5.

Richardson, J., delivered the opinion of the court.

This court is of opinion that the circuit court did not err in overruling the defendant's demurrer to the plaintiff's declaration. The principle stated by Lacy, J., in *Dun* v. *Seaboard and Roanoke R. R. Co.*, 78 Va. 645, and in numerous other cases, has no application here. In that case the facts were admitted on the face of the declaration, and the question of law was, therefore, submitted to the court: "Is the plaintiff entitled to any recovery?" That case decides that a passenger riding with his arm protruding through the window of a moving car is guilty of negligence *per se;* and this fact being alleged in the declaration, it was held bad. The declaration in this case is not open to the same objection. The declaration here contains but one count, which is a copy (except names and dates) of the first count in the declaration in the case of *Sherman* v. *B. & O. R. R. Co.*, 30 Gratt. 504, which was held good on demurrer.

Opinion.

The court is also of opinion that the circuit court did not err in its ruling set forth in the defendant's bill of exceptions No. 1. It is this: The defendant company, after all the evidence on both sides had been introduced, and before the argument commenced, asked of the court that its counsel, in arguing the matter before the jury, should be allowed to discuss the measure of damages in the light of all the testimony submitted by the plaintiff, taken as true and correct, and of such inferences as may be reasonably made from said plaintiff's evidence, and of so much of the evidence given by the defendant company as is not in conflict with the plaintiff's testimony, and only such inferences therefrom as necessarily follow. And the court allowed such request, but held that the jury were not to enquire whether or not the plaintiff was entitled to any damages; that the demurrer to evidence withdrew that question from the jury; that the jury could only conditionally assess the damages sustained by the plaintiff, and in so doing the jury should consider the evidence only as bearing on the measure of damages; and that the defendant's counsel would be permitted to argue before the jury upon all the evidence in mitigation of damages, but not in bar of damages. The exception is to the ruling of the court after the aforesaid words, "but held," &c. This ruling is strictly in accord with the settled rule of practice.

And the court is further of opinion that the circuit court did not err in its ruling with respect to the matter which is the foundation of the defendant's bill of exceptions No. 2. The objection is, that while the plaintiff's counsel was making his opening speech to the jury, he said: "Now, gentlemen of the jury, I will show you what damages other Virginia juries have given. I have some Virginia cases here." The counsel for the defendant objected to plaintiff's counsel being allowed to refer to other verdicts. Thereupon the plaintiff's counsel said he desired to read

to the jury from the case of *Norfolk and Petersburg R. R Co.* v. *Ormsby*, 27 Gratt. 455. But the defendant's counsel objected to the verdict in that or any other case being read. The court properly overruled the objection. While it is the province of the court to give the law to the jury, and of the jury to deal with the facts, it would be an unwarranted restriction upon the legitimate scope of argument of counsel, if not a flagrant act of usurpation, for a trial court to prohibit counsel, in this State at least, from referring to and reading from recognized authorities, and especially from decisions in similar cases by courts of last resort. These are, in fact, the sources of correct information for bench, bar and jury, as in them are garnered up the enduring land-marks of the law,—the truths which have stood the tests of centuries, and have received the sanction of the wisest and best legislators and judges who have gone before us. There can be no wrong or danger in drawing truly from these to enforce the argument of counsel in the cause of which he may be the advocate. If, however, this great privilege is abused, as where counsel, especially in a concluding argument, persists in reading law which is palpably inappropriate, and clearly not applicable to the case under trial, it is not only the right of the trial court, but its duty, to restrain counsel from such course. But in most cases any abuse of the privilege may be checked, and even appropriately rebuked, by calling the attention of the court to the fact at the time, or by asking of the court the proper instruction to the jury. In fact, it is difficult to perceive upon what principle such practice (conceding its impropriety) could be successfully made the subject of review by an appellate court. Both bench and bar are often at honest variance as to the interpretation to be given to the language of text writers, and even of judges of high repute; and though there may be but little difficulty in arriving at the true meaning of the

language used, it is often a matter of perplexity and doubt as to the application of the principle involved, or to determine whether or not the ruling in a given case has any application to the case under trial. Doubtless, in a great majority of cases, if not in every case, it will be safest and best to rely upon the intelligent, watchful integrity of the trial judge.

We come now to consider the case on its merits, as disclosed by the evidence referred to in the defendant's third bill of exceptions.

In the plaintiff's declaration, which contains but one count, it is alleged substantially that the defendant company, on its railway in the county of Montgomery, did carelessly and negligently, and with great force and violence, run and drive one of its engines and divers of its cars and coaches upon and against the plaintiff's intestate, Taylor Harman, there then being, and thereby did so greatly wound said Taylor Harman, that by reason thereof he then and there died, and that his death was caused by said wrongful act, neglect and default of said railway company.

Before adverting to the facts established by the evidence contained in the record, it is but just and proper to make a brief comment on the testimony of Clay Chrisman, the first witness introduced by the plaintiff, and who was with deceased during most of the day on which the accident occurred, and was immediately with him up to within a few moments before he was run over and killed. The statements of this witness, on his examination in chief and cross-examination, are, in certain particulars, so contradictory, and in other respects so vague and unintelligible as to render them unreliable, except when corroborated by the testimony of other witnesses. For instance, in his examination in chief, he says: "Taylor Harman was my uncle. I was with him day he was killed. He went there

to a circus show.  He went to show once.  I went with him
to show-ground, which was above the Central, in the
direction of show-grounds."  Notwithstanding the above
direct and positive statement that the deceased attended
the show, in his cross-examination, this witness makes the
equally positive statement:  "I didn't say he went to the
show once.  I don't know whether he went there or not."
And immediately afterwards he says:  "I went up there,
but didn't go in.  He didn't go to the show.  I said he
went to the show-grounds.  I didn't say I didn't know
whether he went to show or not.  I said he went to the
grounds.  I did not know whether he went in or not.  We
went to the grounds together, stayed there together, and
came away together."  The same witness makes other
equally confused, contradictory, or incredible statements.
These things come to us in the record wholly uncorrected
and unexplained.  We must, therefore, take them as we
find them, and so doing, we can give no credence to the
statements of the witness, except in so far as they are
supported by the testimony of other witnesses.

We come now to consider the case on its merits.  The
following are facts established without conflict in the tes-
timony:

The deceased, Taylor Harman, met his death on the fif-
teenth day of September, 1885, between sundown and dark
of that day, at Central Depot in Montgomery county, while
walking westward on one of the tracks of the company's
railway within the limits of the *railroad yard* at that
point, by being struck, knocked down and run over by a
*tender* attached to engine, which engine was at the time
being backed and was pushing the tender ahead of it, and
was going to the company's coal wharf, a short distance
west of the point of collision, for coal and water.  The
engine in question was a very heavy one, of fifty-five tons
weight.  It was used in pushing heavy trains over the

mountain grades east of the Central, and, in charge of an experienced engineer, had returned, backing, from one of its accustomed tours of service only a very short time before the accident. "The Central Depot," says one of the witnesses, "is considered a terminal point for the eastern and western divisions of the Norfolk and Western Railroad and the New River division. Those coming from east and west, on Norfolk and Western, are considered at end of their route at Central. It is the terminal of the New River Railroad." It is a point at which the company has extensive machine shops, and at which there is much shifting and making-up of trains, and where trains in one form or other are almost constantly passing.

A prominent point connected with the accident in question is the Hoffman House, situated on the south side and near the railroad; and several hundred feet east of the Hoffman House is the depot. West of the depot, and within about one hundred and twenty feet of the front entrance to the Hoffman House, there is a street crossing the railroad at about right angles. About six hundred and thirty feet west of the Hoffman House there is a public road-crossing. The Hoffman House is at about grade, but from a little west of that point, and where the accident occurred, it is a little down grade going west. From the west end of the Hoffman House, going west, the company's road-bed and tracks pass through a cut to the point where said public road crosses the railroad. The bank on the south side of this cut is about two or two and a half feet high at either end, but at the highest point, intermediate, is five or six feet above the railroad bed; and by ascending this bank at the Hoffman House, there was an open, unobstructed way along this bank, some twelve feet wide, over the company's ground and extending to the said public road-crossing west of the Hoffman House; and along this open passway there was a frequently used pass lead-

ing from the west end of Hoffman House to public road-crossing. The bank on the north side of the cut is not so high; and on it there is an open unobstructed passway from the street-crossing east of the Hoffman House to the public road-crossing west of said house, of equal or greater width than that along the bank on the south side, and was smoother and better, there being a made walk of stone and gravel for part of the distance, and an old wagon road for the rest of the way, which was barred to the passage of wagons by posts planted across it, east of the public road, but was open and free to pedestrians. Between these banks is the space—thirty-five or forty feet in width—occupied by the company's road-bed and tracks. The main track of the company's road passes along near to the bank on the south side, being separated therefrom only by the ditch on the south side of the road-bed, and this track passes directly by a platform or walkway in front of the Hoffman House. On the north side of this track, and between it and the track on which the deceased met his death, there was a smooth walkway, leveled up with gravel and cinders and eight feet wide, on which a space of four feet of walkway is left even when two trains are passing on these tracks at the same time. Directly in front of the Hoffman House there are but these two tracks; and on the north side of the northernmost of the two there is, between it and the inconsiderable bank on that side of the road-bed, another open way for footmen west to the road-crossing, and unobstructed except by a third track which switches off from said northern track about two hundred and seventy feet west of the west end of the Hoffman House, and, after getting the proper distance, curves and runs parallel with and distant from the last named track about fifteen feet to the company's coal wharf some distance west of the road-crossing. Thus there were at the point of collision, and from the switch aforesaid west to

the road-crossing, three tracks on the road-bed, and two ample footways—one on each side of the track on which Harman was walking when killed. And a short distance east of said switch, and about three hundred and thirty feet west of the centre of the Hoffman House, there was a cut-off, by which freight or other trains coming from the west, when necessary, passed from the southern or main track to the northern track, and along the latter, eastward, to a point a little east of the centre of the Hoffman House, and thence by a switch, in a northeasterly direction, towards the engine-house, which is north of the railroad.

On each side of the railroad there were dwelling-houses facing the road, but back of the open passways on the respective banks overlooking the roadway. On the south side of the railroad, and in the angle formed by it and the public road, was a lot owned or occupied by Ambrose Robinson, and on which was his residence, there being in front of his house, and next to the railway property, a fence, through which was a gateway leading out into the broad passway along the bank on the south of the railroad. In front of Robinson's gate, he had (some years previous to the accident in question) erected a small foot-bridge across the ditch immediately south of the main track, as a direct way of crossing the railroad in going to church and other places. This foot bridge consisted of two pieces of scantling with planks some three feet long nailed across, and this was laid across the ditch—one end resting on the bank and the other on the end of the ties in the railroad track. This foot-bridge was put there by Robinson for his own convenience, and without the consent of the railroad company, and as often as the railroad company had occasion to clean out the ditch the foot-bridge was thrown out and not replaced by the company's employees. Other similar passways had been erected along the company's ditches, and all were alike removed. This Robinson bridge

had been thus removed some two years before this acci-
dent, and had never been replaced by him, and he says that
if there was afterwards any foot-bridge across the ditch (in
front of his gate), he never saw it.   On the day in question
there seems to have been one or more planks over the ditch
at this point, and it was here that Harman crossed over the
ditch, crossed the main track and the eight-foot walkway,
and got on to the track on which he was killed.   The point
at which he thus crossed the ditch is about seventy-five
feet east of the public road-crossing.

On the day in question there was a circus show near the
Central Depot on ground belonging to or in the control of
the railroad company, and was rented by the latter to the
circus company; the place of the circus exhibition being
west of the public road and on north side of railroad.   A
considerable crowd was in attendance.   On that day the
company's employees in the yard had orders to move trains
slowly and with caution, and during the day trains ap-
proaching the station were accordingly signalled and came
slowly in.   During the day, when engines were passing,
persons standing carelessly on the tracks had to be pushed
out of the way by the company's employees to keep them
from being run over.   In fact, the company on this occa-
sion took extra precautions to guard against accidents.   By
either of the four ways described as aforesaid, persons at
the Hoffman House in going to or returning from the cir-
cus-grounds had to cross the railway once, and only once.
People passed freely up and down the railroad; and many
went and came by the walkways north and south of the
railroad.   From a diagram of the situation, testified to by
witnesses, it is manifest that the open passways north and
south of the railroad were equally as near as along the
railway, and entirely safe, except at the one necessary
crossing by either route.   The deceased, Taylor Harman,
was at Central that day from 9 or 10 o'clock A. M. until his

death. He went upon the show-grounds, but did not attend the circus, and returned to the depot. He was under the influence of intoxicating drink—some of the witnesses say drunk,—but did not stagger in walking.

After 6 o'clock P. M., and some hours after the circus was over, Taylor Harman, in company with his nephew, Clay Chrisman, was at the Hoffman House. Both of them had been drinking during the day. At this time two freight trains were coming in from the west on the southern or main track, the foremost of which was on the cut-off west of the Hoffman House and pulling diagonally across and on the track on which the accident occurred. At about the same time the engineman, with the engine and tender in question, had returned from his accustomed service of pushing trains over the mountain grades east of the Central, had reported at the depot and was backing in the direction of the freight train on the cut-off, and ringing the bell all the time; and on coming within about seventy-five feet of the street-crossing, east of the Hoffman House, stopped for the freight train to pass out of the way, and continued to ring the bell for the switch to be opened so that the engine and tender could back up to the coal wharf west of the road-crossing for coal and water. At this juncture Harman and his nephew, Clay Chrisman, (whose testimony has been referred to and commented on), passed together from the west end of the platform in front of the Hoffman House up the slight acclivity on to the bank overlooking the railway from the south side thereof, and along a path traversing the open way on said bank, and professedly going to the show-grounds, where snacks were sold, to get something to eat, and to see the showmen pack up and move off, Chrisman walking in the path several paces ahead of Harman. On reaching the ditch-crossing aforesaid, in front of Robinson's gate, Harman, who was behind Chrisman, left the path, descended the

embankment, crossed the ditch and main track just ahead of the second freight train, crossed the eight-foot walkway between the tracks, and went on to the next track, where he halted and looked east in the direction of the first freight train, which, we must presume, had not then cleared the cut-off, and just beyond which, on the track on which Harman was standing, the engine and tender were standing and the bell ringing for the switch to open, so that the engine and tender could pass through before the second freight should occupy the cut-off. After looking east, as aforesaid, Harman turned and walked west on the track with his hands behind him and his head down, and seemingly, to those who had the best opportunity of observing him, in a state of mental abstraction. When the switch was opened after the first freight train had passed over the cut-off, the engine and tender backed through and up the track, west, towards the coal wharf, moving at a rate of speed not exceeding three and a half or four miles per hour. After clearing the switch, the bell was still ringing, and the engineman on the lookout saw several parties on the track, all of whom heard the bell and got out of the way except Harman, whom the engineman, as he says, expected to heed the bell and get off the track; but the unfortunate man did not heed the signal, nor did he, after starting to walk on the track as described, look back, or in any way evince any consciousness of the peril of his situation. When the engineman observed this heedlessness he was about one-and-a half cars' length from Harman, and he at once blew the alarm, put on the steam-brakes, and reversed the engine; but it was too late; Harman had been run over and crushed to death, the left wheels of the front truck of the tender having passed over him, and the front left wheel of the next truck being on his body when the engine stopped. The engine pulled a little forward to release the body, which was taken up and placed

on the bank on the south side of the railroad a few feet east of the crossing.

Such are the facts; and there can be no difficulty in applying the principles of law applicable to the case. The question is, did the circuit court err in giving judgment for the plaintiff on the defendant's demurrer to the plaintiff's evidence? We are clearly of opinion that said court did err in its said judgment. In the eye of the law, there can be no doubt that the facts present a plain case of gross negligence on the part of the plaintiff's intestate—a case so plain as to preclude the idea of a legal recovery against the railroad company. In fact, when we carefully scrutinize and weigh all the evidence offered by the plaintiff below, the defendant in error here, not a circumstance is disclosed which reasonably tends to show any carelessness or neglect of duty on the part of the company's agents or employees. The gravamen of the charge in the declaration substantially is, that the deceased came to his death by reason of the careless and negligent running of the engine and tender in question by the railroad company. Such being the charge, it must be established by proof, or there can be no recovery.

The deceased, with his nephew, Clay Chrisman, was at the Hoffman House. The facts proved fully warrant the conclusion that Harman was, to say the least, in a state of semi-intoxication. From Harman's position on the platform in front of the Hoffman House just before he started to the show-grounds to get something to eat, and to see the showmen pack up and move off, he could not, in the exercise of ordinary care, have failed to see the engine and tender back up from the depot to a point near the street-crossing, a little east of where he was, and stand there waiting for the first of the two freight trains, pulling in from the west to clear the cut-off and switch so that the engine and tender could back through and go to the coal

wharf. This opportunity of Harman's to see engine and tender, whether standing or in motion, at any point between the position of the freight train, then passing in front of the Hoffman House, and the depot, several hundred feet east, is obvious from these facts : 1st. There was no train standing or moving, (so far as disclosed by the evidence), on the southern or main track next to the Hoff man House. 2d. The passing train was occupying the second or northern of the only two tracks in front of the Hoffman House, and left that track by a switch leading therefrom, in a northeasterly direction, at a point only a few feet east of the main entrance to the Hoffman House; thus leaving the view of both tracks from that point east as far as the depot, at least, open and unobstructed, and unoccupied, so far as appears by the evidence, except by the engine and tender. That this was the situation of things when Harman left the platform in front of the Hoffman House, is necessarily inferable from the facts proved; it being too, an unquestioned fact, that the engine-man, Coleman, after returning from service east, reported at the depot, and then backed up to near the street-crossing and stopped for the freight to switch off, and was standing there ringing his bell for the switch to open to him as soon as the freight was out of the way.

Thus situated, Harman had two courses open to him : 1st. To wait until the passing freight was out of the way, and the engine and tender had backed up past where he was, and then pass safely over the two tracks to the broad and smooth passway on the northern bank of the roadway; or he could take the eight-foot passway and walk it with comparative safety even though he did not wait for the engine and tender to pass ahead of him; for on this walkway there was a space of four feet even when two trains were passing at the same time. In fact, had he waited, he could have walked on the track following the

engine and tender up the track to the road-crossing, where he could have left the railroad. This course, by either of the two routes named, involved crossing the railroad only once. He did not, however, take this course; he did not wait for the engine and tender to pass up ahead of him, but took or started on another and, under the circumstances, safer route—that along on the bank on the south side of the railroad. This open way extended from the west end of the platform at the Hoffman House, west to the road-crossing six hundred and thirty feet distant, at which point the railroad could have been crossed with absolute safety after the second freight train had passed that point, and when, but for the stop caused by the collision, the engine and tender would also have passed that point.

But, after starting along this safe way on the bank, which overlooked all the complications of tracks, cut-offs, switches and moving trains, Harman, without any notification to his nephew, Chrisman, who was walking several paces ahead of him, suddenly turned from the path of safety, descended the bank (which was several feet high), crossed the ditch on a plank or planks, crossed the main track just ahead of the engine of the second freight train coming in, passed over the eight-foot walkway and on to the second track, looked eastward, and then turned and walked slowly, heedlessly up the track to his death, as already described. As the deceased thus walked up the one track, the freight train ahead of which he had crossed was moving down the other. The conductor of this freight train (sitting at the left window of his caboose) was attracted by the ringing of the bell, and, looking to his front and left (his caboose having just passed the road-crossing), saw the imminent peril of Harman's position, and waived his hand and called out to notify him of his danger—all of which was unheard, or, if heard, was unheeded. About the same time the

witness, Carden (who had just previously seen Harman walking ahead of the backing engine and tender, but thought he would get out of the way as others were doing), while sitting on the front porch of his house, on the north side of the railroad, in conversation with his wife and the witness Hickok, had his attention again called to Harman, and, seeing his great danger, Carden and Hickok both sprang from their seats and called aloud to Harman, trying to arrest his attention and warn him of his danger, and Carden ran to the west end of his porch and repeated his efforts of warning; and at about the same time the engine-man blew his whistle, put on the steam-brakes, and reversed his engine.  At this time Harman must have been thirty or forty feet ahead of the tender.  If he had heard or heeded the signals, or the efforts to notify him of his peril, he could then have saved himself, for one step to the right or left would have taken him off the track and out of danger; but, as if fatality had seized upon him, he seemed not to hear, and certainly did not look, but walked heedlessly to his death.  The engineman (Coleman), a sober and trustworthy man, after relating the circumstances connected with the occurrence, in a manner that bears the impress of truthfulness, says: "It was not possible for me to stop after I saw the man's insensibility to his danger.  I had one hundred and forty pounds of steam on, and applied it to the brakes.  If it had been my brother it would have been the same.  When I first saw him there was nothing to indicate that he was not in possession of all his faculties; saw no signs that he was drunk.  I did all in my power to prevent it."

Now, what is the law of the case?  In 2 Wood's Railway Law, 1267, it is said: "The rule may be said to be that a railroad company is bound to keep a reasonable lookout for trespassers upon its track, and is bound to exercise such care as the circumstances require to prevent injury to

them.   If the person seen upon the track is an adult person, and apparently in the possession of his or her faculties, the company has a right to presume that he will exercise his senses and remove himself from his dangerous position; and if he fails to do so, and is injured, the fault is his own, and there is, in the absence of wilful negligence on its part, no remedy against the company for the results of an injury brought upon him by his own recklessness."

The rule thus concisely stated embodies all the requirements of judicial accuracy, is peculiarly appropriate to the case in hand, and is the law in this State as recognized by repeated decisions of this court.   In fact, it is a principle of almost universal application.   "Where a locomotive with cars attached is standing on a railroad track near a railroad station, or other place where cars are frequently moved forward or backward, a person who goes upon the railroad track, seeing the locomotive and cars, and knowing that they would within a few minutes be moved towards him, and walks upon the track away from the train without keeping watch of its movements, where there was nothing to hinder him from seeing the movements of the train in time to avoid danger, and when he could have gone in the same direction without walking on the track, is guilty of such negligence as will prevent his recovery for an injury caused by the carelessness or unskillfulness of the employees of the railroad, not amounting to wilfulness on their part.   A person so walking upon a railroad track is not free from negligence if he omits to keep watch of the movements of the train, relying upon a rule or custom of the employees of the railroad to give a signal for the moving of the train.   The expectation that such signal would be given does not relieve a person in such situation from constant watchfulness for his safety."   *B. & O. R. R. Co.* v. *Dipew*, 40 Ohio St.; *Richmond and Danville R. R. Co.* v. *Anderson*, 31 Gratt. 312.   In the last named case,

Burks, J., said: "Negligence is the gist of the action. If the injury which resulted in the death of the plaintiff's intestate was occasioned by the negligence of the defendant, and solely by such negligence, there can be no doubt of the plaintiff's right to recover damages for the injury; but if there was negligence on the part of the defendants, and also on the part of the deceased, and the negligence of the latter contributed to the injury, the right of recovery depends upon the circumstances"; citing *B. & O. R. R. Co.* v. *Sherman,* 30 Gratt. 602; *B. & O. R. R. Co.* v. *Whittington,* Id. 805; *R. & D. R. R. Co.* v. *Morris,* 31 Gratt. 200, and other authorities.

Applying these principles to the facts as already stated, which facts are established without conflict in the testimony, it is impossible to conceive upon what principle a recovery could be justly claimed against the railroad company. The principles above stated apply with peculiar aptness to the case in hearing. It is an uncontroverted fact that the plaintiff's intestate lived only a few miles from the Central, where he met his death, and was frequently there. He was, therefore, familiar with the situauation and its surroundings. Moreover, the inference is irresistible that the deceased, in his position at the Hoffman House could, in the exercise of ordinary care and caution, have seen the engine and tender and observed the direction it was moving or was likely to move very soon. In this state of things, he started by a route which, had he pursued it, would have taken him in safety to the point of his destination; but he turned from that way at Robinson's gate, a point elevated several feet above the railroad, and from which, had he looked, he must have seen the engine and tender. But, heedless of all he saw, or could have seen, he descended from the safe way into a position where he had no right to be, placed himself on the track on which the engine and tender was, and, after looking

once, turned and walked away from the engine in the direction it was to go; and so walking, and not again looking, he went recklessly to a horrible death. Being thus on the track where he had no right to be, he was a trespasser, and there being no negligence proved on the part of the railroad company or its employees, the plaintiff stands precluded from any right of recovery against it.

In view of the peculiar character of this case, the reason for the conclusion arrived at is aptly illustrated by the remark of Moncure, P., in *B. & O. R. R. Co.* v. *Sherman, supra,* that "the instinct of self-preservation seemed therefore to require that Sherman should use incessantly, while he was walking upon the track, both his eyes and his ears to discover any signs of danger, whether approaching from behind or before. Had he heeded this plain admonition, he would certainly have escaped all danger. His walking upon the track instead of in one of the paths on the sides of it, and his not properly looking at or listening for danger while so doing, has been the chief, if not the only, cause of death, and at least made him guilty of contributory negligence in regard to such results." This remark is peculiarly appropriate to the case in hand. The case in hand is a far stronger case of negligence on the part of the plaintiff than the case above referred to. Here the plaintiff's intestate, in open day, recklessly left a position of absolute safety and threw himself upon the defendant's railway in the midst of several tracks and moving trains. His negligence was so gross as to look almost like wilful self-destruction.

There being in this case no negligence on the part of the railroad employees, it becomes unnecessary to discuss, in other aspects, the doctrine of contributory negligence, the gross negligence of the plaintiff's intestate being the sole proximate cause of his death. From the facts established and the views already expressed, it is unnecessary to notice

other questions raised by counsel for the defendant in error.

It being thus shown that the circuit court erred in its judgment on the demurrer to evidence, it follows that said court also erred in overruling the defendant's motion to set aside the verdict, which is the subject of the defendant's third bill of exceptions.

For the errors aforesaid the judgment of the circuit court must be reversed, and final judgment rendered by this court on the demurrer to evidence in favor of the defendant, the plaintiff in error here.

JUDGMENT REVERSED.