# 𝔑𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

## TYLER, RECEIVER, v. SITES' ADM'R.

### December 3rd, 1891.

1. RAILROADS—*Trespasses—Company's duty.*—Railroad company is bound to keep a reasonable lookout for trespassers on its track, and to use such care as the circumstances require to prevent injury to them. If trespasser be an adult, apparently possessed of his faculties, the company has a right to presume he will use his faculties and leave his dangerous position, and if he fails to do so and is injured the fault is his own, and in the absence of wilful negligence on its part he has no remedy.

2. IDEM—*Contributory negligence —Case at bar.*—Deaf mute walking on railroad track was struck by engine coming from direction he was going. Engineer saw him about thirty yards ahead, crossing obliquely from right to left side of track. No whistle was blown. Train was visible for nearly a mile from where he was struck;

HELD:

     His own negligence contributed to his death. *N. & W. R. R. Co.* v. *Harman,* 83 Va. 553

Error to judgment of circuit court of Rockingham county, rendered October 21st, 1890, in an action of trespass on the case wherein V. H. Lane, sheriff of said county, and as such, administrator of Thomas H. Sites, deceased, was plaintiff, and the plaintiff in error, S. F. Tyler, receiver of the Shenandoah Valley Railroad Company, was defendant. . Opinion states the case.

*W. H. Travers* and *Sipe & Harris,* for plaintiff in error.

*J. E. Roller* and *C. D. Harris,* for defendant in error.

RICHARDSON, J., delivered the opinion of the court.

The trial court certifies not the facts proved, but the evidence adduced at the trial. From an inspection of the evidence thus certified it is impossible to perceive why the court below did not abbreviate the matter by certifying the facts proved, as there certainly is no conflict of evidence as to any material question arising in the case. But, be this as it may, the material facts, as established by the plaintiff's testimony alone, are these: Thomas H. Sites, the plaintiff's intestate, who was a deaf-mute, was, on the 24th day of May, 1887, while walking on or very near the railroad track of the Shenandoah Valley Railroad Company, about two miles north of Elkton, a station on said road, struck and killed by an engine attached to and drawing a train of freight cars on said road, which engine and train was then in the control and management of the employees, agents and servants of said company. From Elkton the Shenandoah Valley Railroad extends northward, for nearly three miles, " through a level cleared plain, comprising the rich, cultivated river-bottoms lying along the east side of the Shenandoah river in that locality. In the midst of this plain, and about two miles north of Elkton, the accident occurred, at a point where the track is elevated upon a slight fill, estimated at three feet, with nothing to obstruct the view of the track for a distance of nearly one mile to the north and an equal distance to the south." About 600 yards north·of the point where the accident occurred a public road crosses the railway, and a short distance beyond, on the left or west side of the railroad, and some seventy-five yards distant therefrom, is the residence of Mr. Thomas Naylor, at or near whose residence the plaintiff's intestate started to go to the house of Decatur Bear, and seems to have walked along near, but not on, the railroad track for some distance, and then on the track, or on the ends of the ties at the side of the track, and was so walking when he met the train by the engine of which he was struck and killed.

The accident occurred in the midst of the open plain above described, where there was no obstruction to the view of the track for the distance of near one mile, north or south; and at the time of the accident the train was running north and the plaintiff's intestate walking south—meeting it.

Thomas Naylor, above referred to, was introduced as a witness for the plaintiff, and testified " that he lives in Rockingham, six or seven hundred yards from Bear Lithia Springs; that the most direct foot-route from his house to the springs is the railway, up to the crossing; that people are in the habit of using this route, and that witness himself used it; that witness knew the plaintiff's intestate, and that he was at the house of witness on the morning of the accident; that he (Sites) said he was going to Decatur Bear's, which is further south; that the direct route to Decatur Bear's is by the railroad; that he *come* on the railroad about seventy-five yards from witness' house, about two miles from Elkton; that it was about 500 yards from the house of witness to where he could see the road straight; that he (plaintiff's intestate) could not be seen all the way from Elkton—trees would be in the way at the curve; that witness was at home that day, and knew of the accident; that he had heard the whistle for down-brakes; heard the train-man say to the section boss that they had struck a man. They went back, running; when witness got there he saw Sites; he was then dead; he remained there some time; and that witness heard no whistle before the one for down-brakes."

Such is the testimony in chief of Thomas Naylor, and it signifies but little. However, his evidence on cross-examination is more to the point. He says: " He had heard the whistle of the train at Elkton; that Sites said, 'I believe I will go up to Decatur Bear's'; that witness told him not to go until after the train came down; that Sites said, 'he would not walk on the railroad'; that witness wrote on a little tablet that Sites carried with him that the train was in Elkton; that Sites kept next to the fence until he came to the crossing; that he went

upon the track at the crossing, and that at about 150 yards, or perhaps 200 yards from the crossing, he was killed, only two miles from Elkton; that the train stopped 500 yards from where it struck Sites; that they were trying to stop; they stopped and backed back; it was a heavy train; was still down grade from Elkton to where Sites was killed. The grade rises toward the north at crossing; he was walking towards the train when struck. He walked from place to place; was a good workman; wrote a good hand, and spelled well."

George W. Murray, another witness introduced by the plaintiff, testified that he is a plasterer, and was, on the day of the accident, working on Bear's Hotel, in East Rockingham; that he was working on the north end of the hotel, about 500 yards from the Shenandoah Valley Railroad, two miles from Elkton; that Whitlock, witness' son, and a colored man were with him; that colored man is now dead; that witness saw the accident; that at the time they were working on the hotel overlooking railroad; that witness' son was looking through a field-glass. We came up to the window. We saw a man walking pretty fast on the track, with his head down. He was on the far side from us—on the outside of the rail; while looking we saw a train approaching; had heard no warning or signal; was surprised to see it; were not expecting it. They came right together; it knocked him off; ran fifty yards; blew down-brakes and stopped. The train had knocked Sites down the bank; the men came back and looked at him; a material train from Elkton came down and picked him up, and carried him to Elkton; was familiar with foot-path. A man going from Naylor's would have taken that route. People were in the habit of taking this course. Have not noticed particular, but have seen several people passing from that route. Was well acquainted with Sites. He was deaf and mute. On one occasion he called my attention to the fact that he could hear a little. I do not remember his ever hav-

ing shown that he ever heard a train whistle. He was in a bending position when I saw him and recognized him as Sites; it was down grade to near the point where he was killed, but grade on a rise where it struck him. He was walking on the outside of the rail, on the end of the ties, when he was struck; that there was a slight ascending grade north of the point where the accident occurred, but witness could not state the distance from the crossing or the grade; and that there were about eighteen cars in the train, but witness did not know whether they were loaded or not.

On cross-examination this witness testified that it was up grade, going north from the point of the accident; that accident occurred 200 yards south of crossing, and five or six hundred yards from Bear's house; that witness paid no attention to the distance; that the train was an ordinary freight train composed of eighteen or nineteen cars; that for a portion of the way from Elkton it was down grade; that Sites was working at Bear's as a farm hand, but witness did not know what wages he got, but supposed that he could earn fifteen or twenty dollars per month. That witness had had no experience with deaf-mutes; thought Sites had heard knocking in the building, that he had, on one occasion called witness' attention, by putting his hands to his ears, that he heard the sound of the hammer. And the witness further said, " he " (Sites) " was a mute, and you know how much a deaf-mute can hear. Sites made the impression upon my mind that he heard better than Decatur Bear. Bear could hear train whistle at Elkton; and Sites could hear better." On re-direct examination this witness (Murray) stated that " there was no obstruction in the way of seeing the train, looking south to Elkton, for a mile or more; that the train was nearly 100 yards from Sites when witness and those with him first saw it; that the train was moving slowly, was creeping up on him, and that there was no trouble about getting out of the way, if he saw it."

A. J. Whitlock, another witness introduced by the plaintiff,

testified that he is a plasterer, was working for Murray at Bear's Spring at the time of the accident; was on the third story of the building; that Murray and Murray's son were there—no one else; that he saw the accident; that he was fixing to go to work; that Murray said there is a train coming, and handed me the glasses; that by the time he caught the focus the train was nearly opposite the hotel. That he saw a man on the track, which he took to be Sites, who was walking with his head hanging down; that witness saw him throw up his hands just as engine struck him; that when the train passed some one said "where is the man who was on the track." The train stopped, and train hand came back and some one joined him and went back; that after awhile a train came from Elkton and took him (Sites) to Elkton; that the train came for that purpose—it was an hour after the accident. That there was rain and thunder storm, and it had not quit raining when the train came down; that witness had known Sites all his life; that Sites could not talk any, and could hear but very little; that he was a stout man, and as witness supposed, was twenty-four or twenty-five years old.

On cross-examination this witness testifies that Sites was several hundred yards ahead of the train when witness first saw him; that witness cannot tell whether he was on the track or not; he was on opposite side from witness, and witness could not tell whether he was on the track or on the side; that his hand went up just as the train got there; that witness was not certain whether the train struck him or not. And on re-examination, this witness says that he heard no whistle or noise before the man was struck; that he heard the noise of the train when it came opposite Bear's house, and that the train whistled several times after it ran past and stopped. On re-cross-examination, the same witness testifies that Sites could not hear any one talk to him; that witness had seen him point up when it thundered; that he could not communicate except by writing, and that if one could walk up behind him and halloo he could hear.

Such is the testimony of the three witnesses, Thomas Naylor, George W. Murray, and A. J. Whitlock, and they testify to the only really material facts in the case. They, except the witness Naylor, were at work on Bear's Hotel, five hundred yards distant from the place of the accident, and at that distance witnessed what they testified to. The witness, Naylor, was at the time of the accident, at his home, the point from which the plaintiff's intestate took his departure for Decatur Bear's, just a short time before the accident. One of these witnesses, George W. Murray, as before stated, testified that the plaintiff's intestate, Thomas H. Sites, made the impression on his mind that he could hear better than Decatur Bear, who could from his house hear a train whistle at Elkton, a distance of five hundred yards. Other witnesses introduced by the plaintiff testify as to Sites' capacity for hearing. For instance, George Clatterbuck testified that he lived about three and a quarter miles from Harrisonburg, knew Sites tolerably well, and had worked with him on farm and at saw-mill; that Sites could not talk, but he could make a noise; that "when the engine would pop off he would look around and grin, and that witness noticed that he could hear"; that "when fencing plank were carried out he would look up, and when they were thrown down would motion to his ear as if he felt the jar; that when he was about the mill the engine-man, when he wanted him to do anything, would blow the whistle and Sites would look up, and they would motion to him what they wanted him to do." And on cross-examination, this witness stated that "Sites would be thirty or forty yards off when the whistle would blow, and that it was in the winter of 1882 that he saw him hear the whistle."

Abraham Billhimer testifies that he knew Sites all his life, lived near him until 1870, and then moved off four miles; that Sites was a deaf-mute, and could not hear anything except something loud and terrific like thunder, which seemed to scare him very much; that witness was with him a good deal; that after witness moved to the mountains Sites came to

pick cherries; that the whistle blew at a mill one-quarter to one-half of a mile off, and Sites motioned to witness it was dinner-time, and that he knew because the whistle had blown. On cross-examination, this witness stated that Sites had motioned to him that he knew that it was dinner-time, because he had heard the whistle, and that this occurred eight years before. This witness also undertook to repeat the signs by which he communicated with Sites on the occasion referred to.

The plaintiff also introduced Mrs. Mary Sites, who testified that she lives near Keazeltown; that Tom Sites was her son; that she does not know where her husband is; that he is an old man, seventy-three years old, and did not contribute to her support in 1887; that Tom was all her support in 1887, and that he was in his thirty-second or thirty-third year when he was killed; that he was a good hand, quiet and industrious, but was high tempered when provoked. On cross-examination, Mrs. Sites testified that her son, Tom, was away from home a great deal; that he was hurt by a train at Linville on the Baltimore and Ohio Railroad; that he knew it was train time, but the train was late at the time he was hurt at Linville; that witness had often cautioned him about going on the railroad; that she had so cautioned him in the last twelve months before he was killed; that she could not estimate what he had furnished her, but that he would bring her flour, sugar and coffee, meat, &c., just when she needed it, and that he had no family.

The plaintiff also introduced the tables of life expectancy in Matthews' Guide. And V. H. Lane, the plaintiff in the cause, was introduced on his own behalf, and testified that Tom Sites' father was an old man, and was in the almshouse. This is all the testimony on behalf of the plaintiff.

The defendant then introduced C. W. S. Turner, who testified that he knew Tom Sites very well; that witness used the sign language; was born of deaf-mute parents, and had taught at the Deaf, Dumb and Blind Institution in Staunton; had

known Sites twenty years; that Sites was at the Deaf, Dumb
and Blind Institution in Staunton six years; that witness had,
at his own house, frequently conversed with Sites about the
danger of being on railroads. That just after the accident at
Linville, witness, having seen him on railroad track, again
cautioned him; that all pupils at the Deaf, Dumb and Blind
Institution are first instructed to keep off the railroad track.
Saw him on track at Elkton, and told him he had no busi-
ness on the track, and that Sites said he knew it; that
Sites was a total deaf-mute, and was placed at the Deaf,
Dumb and Blind Institution among the totally deaf-mutes;
he spoke no intelligible word; deaf-mutes are sensible to jars
and concussions, but the difficulty is to distinguish what they
are, or from what source they come—they cannot analyze the
sound. That witness saw signs made by Billhimer in his tes-
timony, and by which he professed to have communicated with
Sites, in manner stated by him, and the signs which he repeated
simply mean, in deaf-mute language, the word "two" and
nothing more. That as to Sites' habits, he would do a little
work around; people treated him charitably and kindly; that
witness regarded him as an object of charity, and that he often
asked witness for money with which to buy tobacco.

On cross-examination this witness stated that Sites was a
total deaf-mute; that he feels sounds, but does not hear them;
he feels the noise of a plank when it falls, but does not hear
it. And on re-examination this witness stated, in substance,
that the difficulty with deaf-mutes is to locate the sound or
concussion felt by them. That Sites' mathematics were
limited; that he could probably keep his accounts of his daily
work; that witness had known his father, who is a deaf-mute,
when there was cannonading at Richmond, to recognize the
fact by putting his hands against the window; that it was sen-
sation without the power of location; that he was totally deaf
notwithstanding these sensations. And witness, as an expert,
states that when a man reproduces sound he hears, and not

otherwise; as an evidence that deaf-mutes do not hear sounds, they look round, up, and try to locate the cause.

C. C. Diehl, another witness introduced by the defendant, testified that he was conductor on the train in question; that he was in his cabin at the time of the accident, but knew nothing of the accident until he was told by one of his brakesmen that a man had been struck; that witness' position on a train is first one place and then another; that witness got off as soon as he could and found a man lying down the bank head foremost; that the body was left in charge of brakeman Sandridge, as his train had to go on; that he did not know how many cars were in his train, but thought there were from fifteen to twenty loads; that the grade was a descending grade, and that between seven to nine hundred yards would be required to stop a train at that point running twenty miles an hour, if he was running on schedule time—sometimes more, sometimes less. Did not remember any signal for down-brakes. Ran 200 or 300 yards beyond dead body, owing to rising grade. Stopped in that distance. That Mr. Cranch was engine-man; that he is a strong, sober, cautious engine-driver and man; that deceased was killed 200 yards north of curves, which is sharp; that train could be seen a half mile from where Sites was killed, looking south; was killed between two curves, one north, the other south. We could have seen him; nothing to obstruct the view except some trees, and we could have seen through or by them.

William Mills, another witness introduced by the defendant, testified that he was working on the road-bed of the Shenandoah Valley Railroad, north of the place of the accident, about 2,300 feet, at the time of the accident; first heard the train blow down-brakes; by the time it came near witness it stopped. Sandridge said a man was struck; witness ran back with train-hands to where he was, and the train followed; he was lying with his head down the bank; the ballast train came down and took him to Elkton; the track-hands were working opposite

Naylor's house; grade is down where Sites was struck, it rises just after you reach the crossing. It is 1,890 feet from public-road-crossing to where Sites was struck. There was no fog or anything to obscure the view from point of accident—could see one mile or three-fourths anyway; could see the mill south of the place of the accident. There were some trees, but they did not interrupt view of train; could see engine clear back to Elkton; the track is on a fill of about three feet at the point of the accident.

The defendant also introduced T. B. Cranch, the engine-man in charge of the engine in question, who testified that he saw a man walking in front of the train and coming towards the engine on the left side of the track. The engine was a Baldwin engine, with an extension boiler, and on this engine, for twenty-five or thirty yards ahead, the engine-man cannot see a man on the left side of the track. Witness did not see the man when he was struck; when witness last saw him he was walking right towards the train on the left side of the track, and did not pay much attention to him, as he was walking towards the train going toward the left, witness supposed he would step off. Witness saw the man about the time the injector flew off (this means that the water stopped flowing into the boiler). Witness shut off the steam to correct this, which did not require a minute. Witness did not take much notice of the man, because at the time there were other objects on the track beyond that attracted his attention, which proved to be workmen at work on the track in cut some distance beyond. Witness never gives signals when persons are coming towards the train, and never stops train for persons on the track, because he supposes they will get off. That witness had never made a run without meeting people on the track, and they always get off. It is down grade from Elkton to place of accident. The train was equal to eighteen loaded cars, one and a half empty cars being counted as a loaded car. Could not have stopped train under 200 or 300 yards by blowing down-

brakes and reversing engine. The fireman said, " You have knocked a man off the track." Stopped train as soon as I could, backed train two lengths, got off, and went back. There was a bruise on the face, which was the only part hurt—the end of pilot seemed to have struck him. If standing on the ground beyond the track a man would be struck in that way at this point. Left a brakeman in charge with him. Didn't know the man ; had no knowledge of his condition. He could have seen the train for some distance. If we had to stop every time we see a person we would have no schedule at all for running trains. I saw Sites some distance down the track ; view not obstructed when injector flies off; you must shut off steam, and then engine can run some minutes in that way.

P. P. Shiflett, another witness introduced by the defendant, testified that, as justice of the peace, he presided at the inquest upon the body of Thomas H. Sites ; saw that his face was bruised, but did not remember which side of the face; that the body was lying at the station for some hours, and no steps taken to bury it; that a subscription was proposed, and a few did the necessary work to get body ready for burial; and that Mr. Shepp read the finding of the jury.

W. J. Runkle, another witness for the defendant, testified that he was one of the coroner's jury ; that the face of the deceased was bruised on the left cheek, was cut and bleeding ; that the body was brought there several hours after the accident; that there was no injury back of the head ; only injury was on the face. On cross-examination, witness stated that the body was placed in the depot several hours after the accident and remained there until 12 o'clock next day—no coffin ; that it was sent for by Mr. Sites' friends from 10 to 2 o'clock on the day after he was killed ; that the citizens had taken some steps to have the body buried ; and that the coroner's inquest was at night.

And then the plaintiff introduced R. A. Thurmond, who testified that he knew Tom Sites ; that Sites lived near Taylor

Springs, and had worked for witness; that he was not a lazy man by any means; was a good hand in harvest field; took most of his wages in bacon, &c., which he took home to his mother, and that witness paid him fifty cents a day in harvest. On cross-examination, witness stated that Sites helped him to harvest in 1886; that he worked for witness whenever witness called on him, and that witness employed him two or three days at a time.

This, as certified by the trial court, was all the evidence adduced at the trial, and it is the subject of the defendant's bill of exceptions, No. 1, when, in the nature of things, it should have been the subject of the last bill of exceptions taken by the defendant. Taken altogether, it cannot, in reason, be said that there is any real conflict between the evidence of the plaintiff and that of the defendant.

It is true that four of the witnesses introduced for the plaintiff, to-wit: George W. Murray, A. J. Whitlock, George Clatterbuck and Abraham Billhimer, testify to circumstances from which they seem to draw the inference that the deceased was not entirely bereft of the sense of hearing; or, in other words, that he was not a totally deaf-mute, but could hear some. For instance, the witness Murray, a plasterer, who says that he had had no experience with deaf-mutes, yet testifies that he thought Sites had heard knocking in the building, as he had called witness' attention on one occasion, by putting his hands to his ears, that he heard the sound of the hammer; and he adds: "He was a mute, and you know how much a deaf-mute can hear. Sites made the impression on my mind that he heard better than Decatur Bear. Bear could hear train whistle at Elkton, and Sites could hear better." Now, we are not informed whether or not Decatur Bear was a deaf-mute, but he certainly was not, if, as stated by Murray, he could hear the sound of the whistle from Elkton to his house, a distance of not less than 500 yards; and if the plaintiff's intestate, Sites, could hear better than Decatur Bear, then he was not totally

deaf, a circumstance which, if true, could by no means enhance the plaintiff's claim to a right of recovery against the defendant. But it was indisputably established that the deceased was a totally deaf-mute. It is, therefore, obvious that Murray's statement, though not corruptly so, was false. He ignorantly failed to distinguish between concussion or violent agitation of the air, which is felt by a deaf-mute and not heard, and the sound produced by the same concussion, which is heard by one who is possessed of the sense of hearing. This is fully explained by the witness, C. W. S. Turner, introduced by the defendant, who knew the deceased well, and had known him for twenty years; that witness was born of deaf-mute parents, used the sign language, and had taught at the Deaf, Dumb and Blind Institution at Staunton, and that Sites was at said institution six or seven years; that Sites was a total deaf-mute, and was placed at the Deaf, Dumb and Blind Institution among the totally deaf-mutes; that he spoke no intelligible words; that deaf-mutes are sensible to jars and concussions, but that the difficulty is to distinguish what they are, or from what source they come. This witness, who evidently understood the subject about which he testified, effectually disposes of the false or mistaken testimony of the four witnesses who testified to the effect that, in their opinion, Sites was not a totally deaf-mute; and he especially explodes the simulated testimony of the witness, Billhimer, who says that Sites came to his house to gather cherries, and that while there the whistle blew at a mill from one-fourth to one-half of a mile distant; that Sites motioned to him (Billhimer) that it was dinnertime, and that he (Sites) knew because the whistle had blown. And on cross-examination, this witness (Billhimer) stated that Sites had motioned to him that he (Sites) knew it was dinnertime, because he had heard the whistle; and the witness, Billhimer, undertook to repeat the signs by which he communicated with Sites on the occasion referred to. The witness, C. W. S. Turner, who was present when Billhimer testified and

witnessed the signs repeated by him, says that the signs repeated
by Billhimer, and by which he professed to have communi-
cated with Sites, simply mean in deaf-mute language the word
"two," and nothing more. · And the witness, Turner, an
expert in the treatment of deaf-mutes, and who knew Sites
well, says that he was a totally deaf-mute; that he felt sounds,
but did not hear them; that the concussion or shock felt by
deaf-mutes was sensation without the power of location; and,
as an expert, the witness· states that when a man reproduces
sound he hears, and not otherwise; and as evidence that deaf-
mutes do not hear sounds, they look up and around and try to
locate the cause. This witness knew the facts of which he
testified; and, under all the circumstances, his testimony
should have been received and treated as absolutely conclusive
of the fact that the plaintiff's intestate was a deaf-mute and
could not hear sounds, And on the other hand, the testi-
mony of Murray, Whitlock, Clatterbuck and Billhimer should
have been disregarded, because neither of them were informed
as to the fact about which they testified, and because their evi-
dence went to the establishment of a fact, the existence of
which was, in the nature of things, impossible. It is, there-
fore, clear that in no just sense can it be said that there was
any real conflict of evidence on the point under consideration.
Hence, the facts, which are few and simple, and not the evi-
dence, should have been certified.

Then, whether viewed in the light of all the evidence
adduced on both sides, or in the light of the evidence of the
plaintiff (defendant in error) alone, the simple case presented
is this: On the 24th day of May, 1887, Thomas H. Sites, a
deaf-mute, who had once before received an injury, by being
on or near the railroad track, and who had been repeatedly
warned by friends and acquaintances to keep off the railroad
track, and who had been so warned on the day of his death,
and only a very short time before he was killed, while walking
on or near the track of the Shenandoah Valley Railroad, in the

county of Rockingham, and meeting a train on said road, approaching him from the direction opposite to that in which he was going, was struck and killed by the engine attached to and drawing said train, the accident occurring in an open plain, where the view of the approaching train was unobstructed for a distance of near one mile. The deceased, though a deaf-mute, was possessed of his other faculties unimpaired, including that of sight, and an active, strong man, of some thirty-two or thirty-three years of age. At the time of the accident the train was going north, and Sites was coming meeting it, and walking on the left side of the track, on the outside of the rail, viewed from the position of the engine-man and the direction the train was moving. And the undisputed testimony is that the blow received by the deceased was on the left side of his face, there being no sign of a blow elsewhere on his body; that the deceased was walking rapidly, meeting the train, with his head down; that the engine-man saw deceased approaching the train on left side of the track, and supposed he would get off; that the engine was a Baldwin engine, with an extension boiler, on which, for twenty-five or thirty yards ahead, the engine-man cannot see a man on the left side of the track; that the engine-man did not see deceased when he was struck, but was told of it by the fireman, whose position was on the left side of the boiler, when the train was stopped as soon as it could be, and was backed two train lengths and stopped, when the train-men alighted, walked back to the point of collision, and found deceased lying, with his head down the bank, dead. And that signals are never given when persons are coming towards the train, and trains are never stopped for persons on the track, because it is supposed they will get off.

Such being the facts, we may safely venture the remark that not only was there no ground upon which the plaintiff, the defendant in error here, could possibly be entitled to a recovery from the defendant, the plaintiff in error here, but that if there

was ever a case, more clearly than all others, a case of contributory negligence on the part of the party complaining, this is that case.

In the light of the simple and undisputed facts of this case, there can be no difficulty in ascertaining and applying the principles of law appropriate thereto. Though there is, in no just sense, any conflict of evidence as to any material fact, yet, excluding all the evidence of the defendant, the plaintiff in error here, there can be no doubt that the facts established by the evidence of the plaintiff, the defendant in error here, present, in the most unquestionable form, a plain case of gross negligence on the part of the plaintiff's intestate—a case so plain and clear as to preclude the idea of any just claim to a legal recovery against the railroad company. That evidence fails to disclose any fact or circumstance upon which to base any just claim to a recovery; nor can any just inference be drawn therefrom to warrant such a recovery. In other words, when all the evidence of the plaintiff below, the defendant in error here, is carefully scrutinized and weighed, not even one fact or circumstance is disclosed which reasonably tends to show any carelessness or neglect of duty on the part of the railroad company, or its agents, servants, or employees. The substance of the charge in the declaration is, that the deceased came to his death by reason of the carelessness and negligence of the agents, servants, and employees of the railroad company, in running the engine and train in question. Such being the complaint, it must be established by proof, or there can be no recovery.

In the present case, just before the accident, the plaintiff's intestate was at the house of Thomas Naylor, a witness for the plaintiff, who lived within seventy-five yards of the railroad track, and some two miles north of Elkton station. The plaintiff's intestate expressed his intention to go to Decatur Bear's, in the direction from which the train was to come, and Naylor, who had heard the train whistle at Elkton, informed

the deceased that the train was then at Elkton, and that he had better not start until the train passed; but deceased persisted in his purpose, saying he would not walk on the track, and started, walking in a pathway near the track until he reached the road crossing, some 200 yards distant, where he got on the track, and kept it, until he was knocked down and killed, and at a point where the view of the approaching train was unobstructed for the distance of near one mile.

Now, what is the law of the case? This court, in *N. & W. R. R. Co.* v. *Harman's Adm'r*, 83 Va. 553, approving the rule as laid down in Second Wood's Railway Law, 1267, said: "The rule may be said to be that a railroad company is bound to keep a reasonable lookout for trespassers upon its track, and is bound to exercise such care as the circumstances require to prevent injury to them. If the person seen upon the track is an adult person, and apparently in the possession of his or her faculties, the company has the right to presume that he will exercise his senses and remove himself from his dangerous position; and if he fail to do so, and is injured, the fault is his own, and there is, in the absence of wilful negligence on its part, no remedy against the company for the results of an injury brought upon him by his own recklessness."

The plaintiff's intestate was a trespasser upon the company's track, with fresh warning of the early approach of the train. Naylor said to him, by writing on the little tablet he carried with him, the train is at Elkton now, don't go up to Bear's until the train comes down. He replied by the same medium of communication: "I wont walk on the track." But he was heedless of the warning, and of his promise not to walk on the track, and in a very few minutes got on the track and met a horrible death. Though a deaf-mute, his vision was perfect, and it was all the more incumbent upon him to look and see the approaching train, the full view of which was in no way obstructed, and to leave the track, but this he did not do. To all appearances he was in possession of all his

faculties, and the company had the right to presume that he would exercise his senses and get off the track. That his own careless and reckless act was the sole proximate cause of his death is a proposition too clear for argument. The case is, in every essential particular, ruled by the case of *N. & W. R. R. Co.* v. *Harman's Adm'r, supra.* It follows, therefore, that the court below erred in overruling the defendant's motion to set aside the verdict of the jury and grant a new trial.

At the trial below the defendant asked for five several instructions to the jury, the fifth and last of which the court gave, but refused to give the first, second, third and fourth of the series as asked, and modified each of them, and as modified gave them. To which action of the court, modifying said instructions one, two, three and four, the defendant excepted; and this is the subject of the defendant's second bill of exceptions.

The first instruction is in these words : " The court instructs the jury that a railroad company is bound to keep a reasonable lookout for trespassers on its track, and to exercise such care as the circumstances require to prevent injury to them. If trespasser is adult, and apparently possesses his faculties, the company has a right to presume that he will exercise his senses and remove himself from his dangerous position, and if he fails to do so, and is injured, the fault is his own, and there is in the absence of wilful negligence on its part no remedy against it for the results of an injury brought upon him by his own recklessness; and he is not entitled to recover if the defendant or his employees used reasonable care after the discovery of the plaintiff's perilous position, to avoid injury to him."

The court modified this instruction by striking out, in the latter part thereof, the words " and there is in the absence of wilful negligence on its part no remedy against it for the results of an injury brought upon him by his own recklessness."

That the court erred in thus emasculating this instruction is

too plain for argument. The words stricken out constitute an essential feature of the rule laid down in *N. & W. R. R. Co.* v. *Harman's Adm'r*, and the precise words were employed by this court in laying down the rule in that case, and they are essential to the correct statement of the rule itself. In thus striking out these words, in the presence of the jury, the court not only deprived the defendant of the benefit of a well settled principle, peculiarly applicable to its case, but, in effect, said to the jury that the language stricken out was no part of the rule, and that there *was*, in the absence of wilful negligence on the part of the defendant, a remedy against it for the results of an injury brought upon the deceased by his own recklessness. It is useless to pursue the subject further. The error of the court is palpable.

The second, third and fourth instructions, in the series, simply assert two propositions: first, that certain acts and conduct of the deceased, put in issue in the cause, if proven, constituted gross negligence on his part; and second, that if guilty of such contributory negligence, the plaintiff could not recover unless the injury was wilfully committed. Each of these instructions was modified by the addition of the words, " unless they shall further believe from the evidence that the injury could have been prevented by the exercise of reasonable care by the servants of the defendant in charge of the train, after they discovered the plaintiff's intestate in a perilous position." Not only did the court err in making this addition or additions of similar import to each of these instructions, but there was not a scintilla of evidence in the cause upon which to predicate the modification. By this modification the court, without warrant, assumes that the deceased *was* discovered by the agents and servants of the company in charge of the train in a perilous position; and the jury were left to infer that by the exercise of reasonable care the injury could have been prevented. There is not only no evidence that the peril of the deceased was observed, or that in the exercise of reasonable

care it could have been discovered in time to prevent the mischief, but on the contrary the proof is positive and conclusive that while the engine-man saw the deceased—an adult, and apparently in the possession of all his faculties—on the track and coming meeting the train, and inclining to the left side of the track, in the direction the train was going; and that by reason of the extension boiler, the engine-man's view of the deceased was obstructed for the distance of twenty-five or thirty yards ahead ; and that the engine-man, from the direction the deceased when last seen by him was taking, he supposed he would step off and out of danger. The law is that he had a right to presume that the deceased, an adult, and apparently in the possession of his senses, would use them, and remove himself from his position of danger. Having the right, under the well-settled law, to so presume, that is the end of the matter. It is not pretended that the engine-man knew the deceased, or knew that he was a deaf-mute. In fact, the deafness of the deceased in no way palliated his gross negligence, which was the sole proximate cause of his death.

For these reasons the judgment of the court below must be reversed and annulled, the verdict of the jury set aside, and the cause remanded for a new trial to be had therein in accordance with the views expressed in this opinion.

JUDGMENT REVERSED.